**UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**

---

**No. 95-11127**

---

**RICHARD M. SCAIFE, doing business as**
**Scaife Flight Operations;**

                                        **Plaintiff - Appellant,**

**H. YALE GUTNICK,**

                                              **Appellant,**

**VERSUS**

**ASSOCIATED AIR CENTER INC., a corporation,**

                                        **Defendant - Appellee.**

---

Appeal from the United States District Court
for the Northern District of Texas

---

November 14, 1996

Before REYNALDO G. GARZA, DeMOSS, and PARKER, Circuit Judges.

DeMOSS, Circuit Judge:

    In this case, we are asked to review the district court's decision granting summary judgment in favor of Associated Air Center and against Richard M. Scaife t/d/b/a Scaife Flight Operations on Scaife's breach of contract claim. The district court also entered an order imposing monetary sanctions against Scaife and non-monetary sanctions against H. Yale Gutnick, Scaife's Pittsburgh counsel. Scaife appeals from the summary judgment order and Gutnick appeals from the order imposing sanctions. For the forthcoming reasons, we hold that no contract was ever made and,

therefore, we AFFIRM the district court's decision granting summary judgment. However, we find that the district court abused its discretion by ordering sanctions against Gutnick and VACATE the order of sanctions against Gutnick.

## BACKGROUND

In 1993, Scaife Flight Operations began accepting bids for a corrosion inspection and customized renovation of the interior of Richard Scaife's personal aircraft, a DC9-15. Scaife hangers and maintains the aircraft in Latrobe, Pennsylvania. On March 24, 1994, Jeff Bosque, one of Associated Air Center's ("AAC") representatives, sent a letter and an original proposed Modification Agreement to perform a corrosion inspection and renovate the aircraft to Scaife's chief pilot, Dan Harbaugh. AAC, a Texas corporation with its principal place of business in Dallas, Texas, repairs and renovates aircraft. The proposal and bid for $2,300,000 was executed by AAC's president, Roy Gilbreath. In a letter attached to the proposal, AAC expressly requested that Harbaugh execute the agreement and "return one fully executed copy to [AAC] for our files."

Harbaugh sent the agreement to one of Scaife's attorneys, Thomas Zwilling of Strassburger McKenna Gutnick & Potter. On March 30, AAC representative Bosque faxed an unexecuted second proposed Modification Agreement directly to Zwilling. This second agreement incorporated suggestions from Zwilling which materially changed the

2

first agreement.  Zwilling then faxed the second revised agreement to Harbaugh.

The next day, Zwilling sent an unexecuted four-page fax to Bosque with several changes to the second revised agreement. Bosque made these revisions and faxed an unexecuted third proposed Modification Agreement back to Zwilling.  Bosque was supposed to send a final Modification Agreement with AAC's authorized signature to Zwilling by April 4.  In fact, expecting Bosque to send the signed agreement to Zwilling, Harbaugh had arranged to travel to Zwilling's office on April 4 to sign the agreement on behalf of Scaife Flight Operations.

Bosque never sent a final agreement to Zwilling or any other Scaife representative.  Harbaugh contacted AAC and asked Bosque why AAC never sent the final agreement.  Bosque explained that AAC had concerns about the scope of work to be performed on the aircraft. Bosque asked Harbaugh whether Scaife would consider changes in the agreement to reduce certain costs for AAC.  Harbaugh declined. AAC's President, Roy Gilbreath, also told Harbaugh that AAC had underbid the job by $200,000 to $250,000.  Gilbreath then attempted to continue the negotiations with Harbaugh.  Harbaugh again refused to modify the agreement and stated that Scaife expected AAC to honor the final agreement.

When AAC failed to begin work on the aircraft, Scaife brought this breach of contract action in the United States District Court for the Western District of Pennsylvania.  The case was later transferred to the Northern District of Texas on the basis of a

3

forum selection clause in the proposed contract.[1]  After receiving

the case from Pennsylvania, the federal district court in Texas

entered its standard order for the parties to participate in a pre-

trial settlement conference.  Paragraph 9(a) of the order required

that all parties and counsel participate in person, not by

telephone or other remote means.  Later, the district court entered

a Mediation Order stating:

> The named parties shall be present during the
> entire mediation process and each party which is
> not a natural person must be represented by an
> executive officer with authority to negotiate a
> settlement.  Counsel and parties shall proceed in a
> good faith effort to try to resolve this case.

The instructions from the mediator also required that "party

representatives must have authority to settle and all persons

necessary to the decision to settle shall be present."

Before the scheduled mediation, AAC learned that Richard

Scaife was not going to attend and that Scaife planned on sending

Harbaugh in his place.  AAC contacted the district court and told

the court of this development.  Scaife's local counsel requested a

conference for the purpose of determining whether Richard Scaife

was required to attend the mediation.  At the conference, local

counsel explained to the district court that Mr. Gutnick, Scaife's

---

[1]  All of the drafts of the modification agreement relied upon
by Scaife as constituting the alleged contract required that any
disputes arising under the agreement "shall be governed by the law
of the State of Texas."

4

Pittsburgh lawyer, told Scaife that Harbaugh should attend the mediation and that his attendance was not required. As a result, Scaife had not made plans to attend.

The district court made it clear during the conference call that Scaife was expected to attend the mediation. Local counsel advised Gutnick of the district court's position. Scaife purportedly told Gutnick that he did not want to appear and authorized Gutnick to file a motion to voluntarily dismiss the case without prejudice to avoid violating the court's order requiring him to appear at the mediation. This motion was filed on September 20, 1995.

The next day, Scaife's local counsel appeared at the mediation without Scaife and tendered a check to the mediator. AAC filed a motion to dismiss with prejudice under Rule 16(f) and 41(b) as a sanction for Scaife's failure to appear. The district court scheduled a hearing for both Scaife's voluntary motion to dismiss and AAC's motion to dismiss, which included a motion for sanctions. After the hearing, the district court denied AAC's motion to dismiss and entered a sanction order against Scaife and Gutnick. The district court ordered Scaife to pay all of AAC's expenses, including attorney's fees, incurred in preparing for and attending the mediation session and the subsequent hearing on the motions to dismiss. The district court sanctioned Gutnick by admonishing him that his role, as officer of the court, is not to unilaterally interpret away a court order by advising his client to do something other than what the court's order plainly requires. The district

5

court ordered Gutnick to (a) publish the district court's memorandum order to all members of his firm; (b) bring the memorandum order to the attention of any court to which he may apply in the future; and (c) file a personally signed certificate acknowledging that he read the memorandum and agrees to comply with the stated terms of the sanction order. Five days later the district court entered summary judgment against Scaife on the breach of contract claims. Scaife appealed from the district court's summary judgment order and Gutnick appealed from the district court's order imposing sanctions.

## DISCUSSION

We review the district court's decision to grant summary judgment *de novo*. **Burditt v. West American Ins. Co.**, 86 F.3d 475, 476 (5th Cir. 1996). The district court's sanction order is reviewed for abuse of discretion. **Natural Gas Pipeline Co. of America v. Energy Gathering, Inc.**, 86 F.3d 464, 467 (5th Cir. 1996).

*1. The Contract*

Scaife contends that the district court erred in treating the formation of a binding contract as a legal issue for the court to decide. **Foreca, S.A. v. GRD Development Co., Inc.**, 758 S.W.2d 744, 746 (Tex. 1988) (holding that questions concerning the formation and terms of a particular contract, and the intent of the parties, were properly considered questions of fact for a jury to decide).

6

Scaife argues that substantial evidence of offer and acceptance exists in this case to warrant submitting the case to a jury. Scaife notes that AAC executives, Bosque and Gilbreath, admitted in deposition testimony that the terms and conditions of the Modification Agreement had been fully and fairly agreed upon by the parties and that AAC was willing to proceed until Gilbreath unilaterally terminated the contract.

Scaife also argues that the district court incorrectly framed the issue as whether the parties intended to make a signed or unsigned written contract. Scaife contends that the issue turns on whether the parties intended signatures to be a condition precedent to an enforceable contract. As support for this proposition, Scaife notes that Bosque's March 24 cover letter to Harbaugh states "[w]e now have everyones [sic] verbal approval on both the contract language and payment schedule. The enclosed contracts are for the modification and maintenance of [the aircraft]. Please return one fully executed copy to us for our files." Scaife contends that this letter shows AAC's intent to have the execution of the contract considered a mere formality.

Scaife argues next that the district court ignored the factual distinctions between the cases it cited and the present case. Scaife contends that in the case heavily relied upon by the district court, *Simmons and Simmons Constr. Co. v. Rea*, 286 S.W.2d 415, 418 (Tex. 1955), the Texas Supreme Court found no evidence that the parties intended the writing to be a binding contract absent their signatures. In contrast, Scaife argues that a wealth

7

of evidence exists to show that signatures were not required to make a binding contract in this case. As support, Scaife contends that it deposited $800,000 into its bank account on April 5 as the first installment became due and cut a check payable to AAC on the same day. Scaife also notes that Harbaugh made lodging arrangements near AAC's facilities for the three months that the aircraft was scheduled to be worked on and that Harbaugh told two other bidders that Scaife had chosen AAC for the renovation work.

Scaife also argues that, in **Simmons**, the plaintiff sued to enforce a contract even though the defendant never indicated that he accepted the contract. Scaife contends that the district court erred in relying on this case because the defendant AAC is the signatory and there is no question that AAC intended to be bound by this agreement. Scaife maintains that the district court also incorrectly cited **Simmons** for the proposition that "if parties negotiating a contract intend for the contract to be reduced to writing and signed, then no contract is formed unless and until the writing has been executed by both the parties." According to Scaife, **Simmons** does not stand for this proposition.

AAC argues that Texas law states that if the parties intend for the contract to be reduced to writing, no offer and acceptance exists unless and until the writing is executed by all the parties. **Simmons**, 286 S.W.2d at 418. AAC contends that the summary judgment evidence proves that Scaife and AAC intended the agreement to be signed by both parties. For example, AAC notes that (1) the agreement had signature blocks for the parties to sign; (2) the

8

language in the agreement provided "IN WITNESS WHEREOF, the parties have caused this agreement to be executed by their duly authorized representative at Dallas, Texas, on the first date written above;" (3) one third of the contract price was due "upon the signing of the contract;" (4) the aircraft was to be delivered to the owner within 90 days subject to the execution of the contract; and (5) a clause in the contract stated that no party could alter or amend the contract except in writing signed by both parties.

Furthermore, AAC argues that Harbaugh's deposition testimony stated that Bosque would have Gilbreath sign the agreement and then ship it to Scaife Flight Operations for Harbaugh to sign. Harbaugh stated that he did not want to make another trip to Zwilling's office to sign the agreement unless it would definitely be there. AAC maintains that this evidence shows that Scaife and AAC intended for the agreement to be signed before a binding contract was formed.

Further, AAC maintains that the district court's reliance on *Simmons* was proper because that case reached the issue of whether a signature was required on a contract as a condition precedent for formation of the contract. As in the present case, the summary judgment evidence shows that AAC and Scaife intended for the signatures to be a condition precedent to the formation of the contract. AAC contends that regardless of how the issue was framed, each party's signature was required for the formation of this contract. Scaife's attempt to distinguish *Simmons* fails

9

because **Simmons** established that if parties negotiating a contract intend to require signatures, then a contract is not formed unless both parties sign the contract. **Simmons**, 286 S.W.2d at 419.

The issue of whether the parties required that the agreement be signed to be considered binding is one of intent, and, therefore, the issue is normally a fact question for the jury to decide. **Foreca**, 758 S.W.2d at 746; **Scott v. Ingle Bros. Pacific, Inc.**, 489 S.W.2d 554, 556 (Tex. 1972); and **Simmons**, 286 S.W.2d at 417. However, the district court decided that Scaife's assertions did not raise a genuine issue of material fact concerning whether the parties intended to make signatures a requirement for the formation of a binding contract and, on these grounds, the district court granted summary judgment. We note that parties may enter into an oral contract even though they are contemplating a formal writing. *See* **Simmons**, 286 S.W.2d at 418. The subsequent writing then becomes merely a "convenient memorial" of the agreement. **Cothron Aviation, Inc. v. Avco Corp.**, 843 S.W.2d 260, 263 (Tex. Ct. App.--Fort Worth 1992, writ denied). The "convenient memorial" doctrine usually requires a finder of fact to ascertain whether the parties intended to be bound by the agreement before the agreement was formally executed. **Id.**

However, the question presented here is not whether there was a prior oral contract. The evidence clearly shows that the parties intended that a written contract would govern their agreed upon obligations. Instead, the question presented is whether the third proposed agreement was accepted and became a binding contract

10

without the signatures of the parties. When reviewing written negotiations, the question of whether an offer was accepted and a contract was formed is primarily a question of law for the court to decide. *S & A Marinas, Inc. v. Leonard Marine Corp.,* 875 S.W.2d 766, 769 (Tex. Ct. App.--Austin 1994, writ denied). If an agreement has been reduced to writing, as it was in this case, an assent to the writing must be manifested. *Simmons*, 286 S.W.2d at 418; *Cothron Aviation*, 843 S.W.2d at 264. Manifestation of assent "commonly consists of signing and delivery." *Simmons*, 286 S.W.2d at 418; *and see Cothron*, 843 S.W.2d at 264.

The contract in this case was revised at least three times and expressly contained signature blocks for the parties. All three of the proposed agreements, entitled "Aircraft Modification Agreement," included the following clause and signature blocks:

> IN WITNESS WHEREOF, the parties have caused this Agreement to be executed by their duly authorized representative at Dallas, Texas, on the date first above written.
>
> SCAIFE FLIGHT OPERATIONS
> By:_____
> Duly Authorized Representative
> Date:_____
>
>         ASSOCIATED AIR CENTER, INC.
>         By:_____
>             Roy G. Gilbreath
>             President
>         Date:_____

Harbaugh's deposition testimony explained that Gilbreath was to sign the agreement for AAC and send it to Zwilling's office for Harbaugh's signature. The contract was never delivered and neither party ever signed the agreement. "If parties negotiating a

11

contract intend that the contract shall be reduced to writing and signed by the parties, ... then either party may withdraw at any time before the written agreement is drawn up and signed by both parties." ***Gasmark, Ltd. v. Kimball Energy Corp.***, 868 S.W.2d 925, 929 (Tex. Ct. App.--Fort Worth 1994, no writ) (citing ***Premier Oil Refining Co. of Texas v. Bates***, 367 S.W.2d 904, 907 (Tex. Ct. App. --Eastland 1963, writ ref'd n.r.e.)).

In this case the contract was never signed. Signature blocks were included on the contract and Scaife took affirmative steps to ensure that a representative would be able to sign the agreement once a finalized contract had been prepared and signed by AAC. We hold that the parties contemplated the formation of a binding agreement to include the signatures of both parties. No evidence shows that AAC began work on the aircraft or acted in any affirmative manner to assent to the agreement notwithstanding the lack of delivery and formal execution of the contract. ***Foreca***, 758 S.W.2d at 746 n.2 (listing criteria which may be helpful in determining whether a contract has been formed, such as whether a party takes action in preparation of performance). After carefully reviewing the summary judgment evidence, we agree with the district court that the parties intended to manifest their assent to this agreement through a formal written contract signed by both parties. We hold that no contract was ever formed and, as a result, summary judgment was appropriate in this case.

*2. Sanctions*

Federal courts have inherent powers which include the authority to sanction a party or attorney when necessary to achieve the orderly and expeditious disposition of their dockets. ***Chambers v. NASCO, Inc.***, 501 U.S. 32, 43 (1991); ***Natural Gas Pipeline Co.***, 86 F.3d at 467. We review sanctions imposed under the district court's inherent powers for abuse of discretion. ***Natural Gas Pipeline Co.***, 86 F.3d at 467.

"[T]he threshold for the use of inherent power sanctions is high." ***Chaves v. M/V Medina Star***, 47 F.3d 153, 156 (5th Cir. 1995). "Such powers may be exercised only if essential to preserve the authority of the court and the sanction chosen must employ the least possible power adequate to the end proposed." ***Energy Gathering***, 86 F.3d at 467 (internal quotations omitted).

At the conference held the day before the mediation, the court advised Gutnick that Scaife would be required to attend. Because Scaife was unable to attend the mediation on such short notice, Gutnick filed a motion to dismiss without prejudice to avoid violating the district court's order.

The district court then held a hearing on the motions to dismiss filed by both parties. AAC's motion also included a motion for sanctions. After the hearing, the district court issued an order imposing sanctions on Scaife, requiring Scaife to pay all costs associated with the aborted mediation and the motions to dismiss. This sanction order was not appealed by Scaife.

The district court also sanctioned Gutnick by admonishing him not to unilaterally interpret away a court order by advising his client to do something other than what a district court's order requires that client to do. The district court sanctioned Gutnick by requiring him to (a) publish the district court's memorandum order to all members of his firm; (b) bring the memorandum order to the attention of any court to which he may apply in the future; and (c) file a personally signed certificate acknowledging that he read the memorandum and agrees to comply with the stated terms of the sanction order.

Gutnick argues that the district court abused its discretion because the sanctions order is grossly excessive and the court did not issue specific findings to show that Gutnick acted in bad faith. *See* **Dawson v. United States**, 68 F.3d 886, 895 (5th Cir. 1995) (noting that in order for a district court to impose sanctions under its inherent power a specific finding of bad faith must be made). Gutnick contends that he never advised Scaife to disobey the court order to appear at the mediation hearing and that Scaife never wilfully violated the court's order. Gutnick argues that he and Scaife acted on good faith reliance that Harbaugh's attendance was sufficient to satisfy the requirements of Rule 16 and the pretrial and mediation orders to send a person with settlement authority to the mediation.

Gutnick contends that the sanctions assessed not only harm his personal reputation, but restrict his ability to practice in other state and federal courts by requiring him to submit a copy of the

14

sanction order to any bar which Gutnick is not currently a member. Gutnick argues that the sanction order violates the Tenth Amendment by invading the exclusive authority of state courts to regulate admission to their respective bars. Further, Gutnick contends that the district court's order violates 28 U.S.C. § 2071 because it creates new conditions for Gutnick's admission to practice in other federal courts. Finally, Gutnick argues that he was denied due process because the district court failed to provide him with an adequate notice and opportunity to be heard on the sanction issue.

After carefully reviewing the record in this case, we hold that the district court abused its discretion by failing to employ the least severe sanction adequate to achieve the desired result. It is understandable that the district court would believe that some sanction was required when, after issuing an order and holding a conference to clarify the order, Scaife and Gutnick ignored such order. However, Gutnick explained that he made the decision to have Harbaugh attend the mediation because he was the only person involved with the contractual negotiations for Scaife Flight Operations. Harbaugh had all the requisite authority to settle the case. Scaife was not involved in the contractual negotiations and had no knowledge of the underlying facts of this dispute. Therefore, Gutnick decided that Harbaugh would be the best person to attend the mediation.

We hold that the sanctions imposed on Gutnick are overbroad and excessive. We believe that the sanctions requiring Scaife to pay all costs associated with the mediation and subsequent motions

15

to dismiss is adequate and sufficient to serve the necessary purpose of deterrence. Therefore, we vacate the district court's order imposing sanctions on Gutnick.

**CONCLUSION**

For the foregoing reasons, we **AFFIRM** the decision of the district court granting summary judgment in favor of AAC and **VACATE** the sanctions assessed by the district court against Gutnick.

16